(A.R.D. 180)

United States *v.* F. P. Dow, Inc., of Los Angeles, a/c Olympic Plastics Co., Inc.

Entry No. 3249.

First Division, Appellate Term

(Decided January 6, 1965)

*John W. Douglas,* Assistant Attorney General (*Morris Braverman,* trial attorney), for the appellant.

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the appellee.

Before Oliver, Wilson, and Nichols, Judges

Nichols, Judge: This is an application for review of a decision and judgment of Donlon, J., holding that the cost of production of a fully automatic bottle blow molding machine, imported from Eng-

land and entered at the port of Los Angeles on July 24, 1957, was $14,000.  *F. P. Dow, Inc., of Los Angeles, a/c Olympic Plastics Co., Inc.* v. *United States*, 51 Cust. Ct. 440, Reap. Dec. 10616.

The parties are in agreement that cost of production, as that value is defined in section 402(f) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, is the proper basis of appraisement.  Appellant claims, however, that the proper amount thereof is $28,000.

The trial court found the four statutory components of the cost of production of the imported machine to be:

| | |
|---|---:|
| Materials | $  4,760 |
| Labor | 2,464 |
| | |
| Sec.  402(f)(1) | 7,224 |
| Usual general expenses (180 percent of the cost of labor) Sec.  402(f)(2) | 4,435 |
| Cost of packing, etc. Sec.  402(f)(3) | 560 |
| Addition for profit (14.6 percent) Sec.  402(f)(4) | 1,781 |
| | |
| | $ 14,000 |

Appellant does not contest the first three figures, but claims that an additional sum of $14,000 should be included in the profit component, claimed to represent a fee charged for the exclusive right to use the machine.  Appellee contends and the trial court held that said amount is not a part of cost of production.

The pertinent facts in the record are as follows:  About a year and a half prior to the importation of the machine involved herein, Olympic purchased from the British manufacturer, E. Shipton & Co., Ltd., a semiautomatic blow molding machine for the price of $12,000, which included a so-called license fee of $6,000, pursuant to a contract, dated January 16, 1956.  (Plaintiff's collective exhibit 1.) The contract granted to Olympic exclusive rights in 11 Western States to use the process of the licensor for the manufacture of hollow articles; to use the machine purchased from the licensor in carrying out said process; and to use the licensor's method of printing for printing hollow articles, subject to a royalty of 2 per centum of the "ex-works" price of such articles.  The contract also contained the following clause:

13.  IN the event that the demand for hollow articles within the said territory should increase to quantities profitable to Licensee sufficient to warrant the installation of fully automatic machines in the Licensee's plant the Licensee will purchase and Licensor will sell to Licensee such a fully automatic machine from the Licensor at the price of twenty eight thousand Dollars ex-works the

price being subject to any increase of cost in labour or raw material which may occur between the date of this Agreement and the date on which the order for such fully automatic machine is placed.

According to Bernard Strong, a director of Shipton, this amount was put in clause 13 because it was estimated to be the price if one machine were to be required, in which case a license fee of $14,000 would be included. However, the $28,000 figure was not broken down, and the allocation of $14,000 of it to the license fee rests on oral testimony only. At that time, Shipton had had insufficient experience in building fully automatic machines to know what they would cost.

However, when the time came for the purchase of automatic machines, one of which is involved herein, a new agreement was negotiated. A purchase order, dated April 2, 1957, provides for the delivery over a 3-year period of six fully automatic blow molding machines at a price of $14,000 each. A cancellation charge of $28,000 was to be paid if only two out of the six machines were taken. (Plaintiff's exhibit 2.) The purchase order did not require the payment of a licensing fee as such and none was paid. The price of $14,000 had been arrived at in the course of negotiations between the importer and Shipton, in view of the order for a large quantity of machines, which would give the manufacturer more royalties on the hollow goods produced.

Because of later developments, such as the availability of equipment made in Hong Kong and Japan, the deterioration of the patent situation which increased competition, and the introduction of new kinds of plastic materials, Olympic did not take all six machines, and, after negotiations, a new purchase order was written. The new order, dated September 8, 1958, long after the date of entry of the machine here involved, provided for the purchase of four machines at $21,000 each. (Plaintiff's exhibit 3.) The present machine, although already imported, was included among these four machines. According to David Rome, president of Olympic, the $21,000 reflected the price of the machine, plus a "cancellation charge," the actual cost of the machine being $14,000. In effect, this agreement was a settlement for a partial termination. As it subsequently developed, Olympic took only three machines and paid a total "cancellation charge" of only $17,709.

Mr. Strong testified that, prior to negotiating with Olympic for the sale to it of fully automatic machines, his firm had sold three such machines to Lido Toy Co. for $14,000 each, plus a total license fee of $42,000. For this, Shipton granted Lido "an exclusive arrangement in the toy field that we would not put people into competition with them in the toy field in the United States—people who were directly competitive with them in the toy field." A clause similar to

clause 13 in plaintiff's collective exhibit 1 was included in the agreement with Lido, but it indicated that $14,000 was for the machine and $14,000 for the license fee. This agreement is not in evidence, and the foregoing information about it was developed in oral testimony.

Mr. Strong testified further that, during 1957, there was only one competitor manufacturing a fully automatic blow molding machine, but that firm did not start making its machine until August or September of that year. Shipton had no way of obtaining that firm's profit figures, since it was completely illegal for them to compare costs and profits. The witness did learn that the price charged by that firm was the same as Shipton was charging Olympic.

Although the parties and the court below have discussed at some length the question of whether a license fee for the exclusive right to use a patented machine and a patented process in an exclusive territory in the United States is properly a part of profit in the "cost of production" formula, we confront another question before we get to that one: whether the facts in this case establish that such a charge was "ordinarily" assessed. Of course, it is difficult to establish what is ordinary with respect to a mere handful of transactions, all separately negotiated. However "cost of production" is the residual method of appraisement, and the Congress expected this court to find some way of applying it whenever more preferred methods were already eliminated. So it is necessary to reject transactions that are manifestly not "ordinary," and if any remain, however few, to draw on inferences from them. Here, moreover, the court has had the benefit of testimony as to costing and profit markup direct from the headquarters of the foreign producer.

It appears from the record that no license fee was charged in connection with the purchase of the machine here in question. Such a fee, so-called, had been paid when a semiautomatic machine had been purchased over a year prior to the present importation. A clause in that contract provided that if an automatic machine were ordered subsequently, the price would be $28,000, and there was testimony that that meant $14,000 for the machine and $14,000 for the license. This was only an option which was never exercised. It was superseded by the purchase order in accordance with which the present machine was imported. That order provided for a purchase price of $14,000, and no license fee was required or paid. Had this agreement been carried out fully, it is clear that no more than $14,000 per machine would have been paid. Intervening circumstances caused a change, and Olympic decided to take only four machines instead of six. More than a year after the importation involved herein, a new purchase

order, which nevertheless included the present machine, was negotiated, stating the purchase price to be $21,000 per machine. The testimony establishes that the $21,000 represented in fact the price of the machine at $14,000, plus damages for canceling a part of the original order.

The question then arises in the court's mind as to whether the "cancellation charge" is properly a part of the profit. (Neither appellant nor appellee so argues.) It did not come into being until long after the machine was produced and imported, and is in the nature of damages for failure to carry out the original agreement. It is clearly not a part of the cost of materials, labor, or packing. It is not a *usual* general expense, nor is it profit *ordinarily* added, since it is obvious that manufacturers and sellers do not customarily do business on the basis of contracts that have to be renegotiated and damages paid for partial termination.

A somewhat analogous situation was before the court in *The Merthyr Company, Inc.* v. *United States*, 44 Cust. Ct. 695, Reap. Dec. 9692, which involved a so-called termination bonus which the manufacturer was required to pay if it terminated an exclusive contract with its customer. The Government claimed that it was a part of cost of production because, at the time of manufacture, the producer knew it might have to pay it. The court pointed out, however (p. 698):

* * * Acceptance of this contention would lead to absurd results in that shipments of commutators to previous customers of Dayton would be valued at a price including the amount of the bonus, while like commutators shipped to a concern that had not been a customer of Dayton would not be subject to the bonus; hence, there would be no bonus percentage to include in the appraised value. In other words, it could easily happen that two shipments of commutators of the same kind on the same day would have two different costs of production. Such a situation should, however, be avoided in the absence of compelling reasons.

A similar situation would arise here, if the cancellation charge were considered a part of cost of production in this instance, since it would not be applicable to machines purchased by other customers.

Appellant, arguing that the $14,000 "license fee" should be added to the profit component on the ground that it is profit "ordinarily" added by the manufacturer, relies chiefly, if not wholly, upon the sales to the Lido Toy Co. As had been stated, the manufacturer, before the present importation, sold three automatic machines to Lido Toy Co. To what degree these machines were similar to the one before the court has not been established but arguendo we assume they were similar.

If the oral testimony—which is all this court has to go on—is accurate, the Lido agreement was unique. There could only be one of its kind, because obviously, only one party could purchase a monopoly,

covering the entire United States, to use the Shipton machines in the manufacture of toys. Suppose *arguendo* the $14,000 allegedly paid for the "license" is considered "profit" added by the manufacturer in that transaction, can this court hold it is profit *"ordinarily"* added? At times, a unique transaction may be an ordinary transaction, but this is not the case when the circumstances of the transaction themselves make it impossible that it could be repeated. Thus, the Lido transaction fails as evidence that $14,000 allegedly on account of the license was added "ordinarily."

But even if this fee were added to every sales price as a matter of routine, appellant has still not made its case because it has been held repeatedly that payment for a privilege of this kind is not a part of the cost of production as profit or otherwise. *United States* v. *F. B. Vandegrift & Co. et al.*, 26 CCPA 360, C.A.D. 42; *United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, 39 CCPA 86, C.A.D. 468; *United States* v. *Pacific Customs Brokerage Co. for Munsing Wood Products Co., Inc.*, 32 Cust. Ct. 675, A.R.D. 44; *Brauner & Co.* v. *United States*, 44 Cust. Ct. 661, Reap. Dec. 9673; *United States* v. *Henry A. Wess, Inc.*, 48 Cust. Ct. 700, A.R.D. 142; *The A. W. Fenton Co, Inc.* v. *United States*, 52 Cust Ct. 405, Reap. Dec. 10660. These cases, discussed by the court below, stand for the proposition that license fees for exclusive rights are not part of the cost of production.

The witness Strong (whose duties included preparation of production estimates for Shipton) testified that the profit ordinarily added was 14.6 percent, $1,781 for machines such as the instant machine, at or about the time of importation. This is not limited to exports to the United States market. This testimony is substantiated by the purchase order, exhibit 2, under which the instant machine was imported. Figures for other producers were unavailable. This testimony is not impeached or refuted by any or all of the other transactions recounted above. None of them establish or tend to establish that any larger figure was "ordinarily" added. Therefore, the judgment of the trial court is supported by the weight of the evidence and must be affirmed.

For the reasons stated, the judgment of the trial court is affirmed.

On the record presented, we find as facts:

1. That the merchandise herein is a fully automatic bottle blow molding machine, manufactured and exported from England by E. Shipton & Co., Ltd., and entered at the port of Los Angeles on July 24, 1957.

2. That the machine was invoiced and entered at $14,000, and it was appraised on the basis of cost of production at $28,000, which included the $14,000 invoice charge and $14,000 represented as a license fee.

3. That such or similar merchandise was not freely offered for sale in the foreign market for home consumption or for export and was not freely offered for sale in the United States.

4. That, prior to this importation, the manufacturer (as licensor) and Olympic Containers, Inc. (as licensee), entered into an agreement, dated January 16, 1956, which provided for purchase of a semiautomatic machine (not the machine of this suit), including an exclusive license in certain enumerated Western States, to use the licensor's process for manufacture of hollow articles, together with sole and exclusive license to use the said semiautomatic machine in carrying out the process, together with the exclusive permission to use the licensor's method of printing hollow articles.

5. That the agreement provided in clause 13 that should the demand for hollow articles increase sufficiently to warrant the installation of fully automatic machines, the licensee would purchase and the licensor sell such a machine at the price of $28,000.

6. That, on April 2, 1957, after negotiations with Shipton, Olympic ordered six fully automatic blow molding machines at $14,000 each, including the one involved herein. That no license fee was charged in connection with the purchase and sale of these machines.

7. That, on September 8, 1958 (subsequent to the date of importation of the present machine), a new purchase order was written, providing for the purchase of four machines (including the one before the court) at $21,000 each, $14,000 representing the cost of the machine and the balance a charge for canceling a part of the original order.

8. That Olympic actually took only three machines and paid a total cancellation charge of $17,709.

9. That, at and prior to the date of exportation, the cost of producing such fully automatic blow molding machines was:

| Cost of materials | $4, 760 | Cost of packing | $560 |
|---|---|---|---|
| Cost of labor | 2, 464 | Profit (14.6 percent) | 1, 781 |
| Usual general expenses (180 percent of the cost of labor) | 4, 435 | | $14, 000 |

We conclude as matter of law:

1. That the cost of production, as that value is defined in section 402(f) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, is the proper basis of appraisement of the machine in issue.

2. That the cost of production of the instant machine is $14,000, net, packed.

Judgment will be rendered accordingly.