(R.D. 11196)

BELL IMPORTING CO. *v.* UNITED STATES

Entry No. 57–B, etc.

(Decided June 22, 1966)

*Jason H. Floyd* for the plaintiff.

*John W. Douglas,* Assistant Attorney General (*S. William Barr,* trial attorney), for the defendant.

NICHOLS, Judge: The merchandise involved in these appeals for reappraisement, consolidated for trial, consists of various articles of clothing imported from Hong Kong and entered at Gulfport, Miss., during 1954 through 1958. Most of the articles were imported in quantities of one. Each was entered at the invoice value and was appraised at a higher value. It was agreed, at the trial, that the proper basis of appraisement for the merchandise covered by the entries made before February 27, 1958, was cost of production, as defined by section 402a(f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (70 Stat. 943); that the merchandise was not on the final list (T.D. 54521); and that the proper basis of appraisement for the merchandise covered by the entries made on and after February 27, 1958, was constructed value, as defined by section 402(d) of said tariff act, as amended.

At the opening of the trial, counsel for the Government pointed out that appeal No. R60/14663 was filed before the notice of appraisement was mailed to the importer, but that appeal No. R60/15491, concededly timely filed, included all of the entries covered by appeal No. R60/14663, as well as some additional ones. Appeal No. R60/14663 must be dismissed as premature. *Wilmington Shipping Company* v. *United States*, 52 CCPA 89, C.A.D. 864.

John E. Bell testified that he was the owner of the Bell Importing Co. until 1956, at which time it became a corporation, and that it was engaged in importing merchandise from Hong Kong. He visited Hong Kong for the first time in 1953 and contacted several suppliers of clothes. He selected Peninsula Tailor for the purchase of men's clothing and Hong Shing Tailor for women's clothing. He made a written contract, dated March 12, 1955, with K. P. Chan, proprietor of Peninsula Tailor, a copy of which was received in evidence as part of defendant's exhibit A–1. According to the contract, Bell agreed not to purchase men's jackets, suits, and other garments from any person or firm in Hong Kong other than Chan; Chan agreed not to sell or supply directly or indirectly men's garments to any person or firm in the United States other than Bell; and Chan agreed to sell at prices consisting of the cost of material, plus stated amounts for labor, e.g., $11 per suit. In an appendix, it is provided that the price shall be increased by $1.50 for a suit made of material valued at $3 or less per yard and by $2.10 for a suit made of material valued over $3 per yard. (All dollar figures herein are United States dollars unless otherwise noted.)

No contract was entered into with Hong Shing Tailor, which gave Bell a pricelist or flat prices on particular garments.

Bell also made a contract with Li Chung Sang on March 16, 1955, agreeing to employ him as sole purchasing and shipping agent from April 16, 1955, to April 15, 1960. (Defendant's exhibit A–1.) This contract was terminated in April 1956. (Defendant's exhibit A, pp. 2–3.)

Mr. Bell testified that orders, with measurements, were sent to Peninsula and checks made out to Peninsula or Li Chung Sang; that Peninsula purchased the material, which in some cases was selected by Bell; that the price paid for the merchandise was the actual cost of the material, whether bought in Hong Kong or England, plus a cut-make-trim or labor price, in accordance with the contract.

Entries were prepared from the invoices which were made by the people who manufactured the clothes. They showed the actual prices paid for the merchandise. Nothing was added to the invoice prices to arrive at the entered values.

Mr. Bell testified that the cost for a suit of clothes was the labor cost of $13.60, plus the amount Peninsula paid for the cloth. Mr. Bell

priced material in Hong Kong from 1955 to 1958 but did not make any purchases himself. From the fall of 1959 until about 6 months before the trial (which would be about April 1965), Mr. Bell was in the business of manufacturing women's clothing in Hong Kong. Through that operation he became familiar with the cost of labor and material in the Hong Kong area. When asked the amount of profit Peninsula made, he testified:

That's pretty hard to tell because I don't know the cut-back that the jobbers give on the price of the materials. I am afraid I can't answer the exact profit.

He said he could approximate the profit and stated that it was 25 percent of the cost or 20 percent of the selling price, which was the same as he made when he operated a plant in Hong Kong.

There was received in evidence a report of Treasury Representative Frank W. Hammar, dated August 3, 1956 (defendant's exhibit A), exhibits referred to therein (defendant's exhibit A-1), and a supplemental report dated August 29, 1956 (defendant's exhibit A-2). According to the report, there were basically two prices for each item: (1) The price at which the articles were offered to Bell and (2) the price, known as the "indoor price," at which the articles were freely offered to all purchasers for home consumption and for exportation to the United States. The former, which was considerably lower, was arrived at as a result of bargaining and was not intended to apply to other buyers. (Exhibit A, p. 6.) In either case, the price was for a suit or garment made to the intended wearer's measurements, but with fitting calls only if the wearer was a local in the Hong Kong area. Bell sent its customer's measurements with each order. Purchasers at the "indoor price" were mostly locals and tourists buying at retail, and persons who ordered by mail. If a tout brought the customer in about 10 percent was added to the "indoor price" to provide him a commission.

A consolidated pricelist, exhibit D of exhibit A-1, indicates both the Bell price and the so-called indoor price. (Exhibit A, p. 7.) For example, the first item B166, was the Bell number and the number C0436 immediately below was the Peninsula number. (Exhibit A, p. 7.) The Bell price for a B166 flannel suit was $23.65, and the "indoor price" was $34. (Exhibit A, p. 8.) Exhibit G of exhibit A-1 states that the price of $23.65 was determined by finding the cost price per yard from exhibit D, as $3.25; ascertaining the amount of material required from columnar heading, exhibit G, as 3¼ yards; adding the material profit, $2.10; and adding the labor charge from columnar heading, exhibit G, $11.

Item B166 on the invoice accompanying entry 20–B was invoiced at $23.65 and was appraised at $34. A comparison of some of the

entries with the consolidated pricelist, exhibit D, indicates that some of the identifiable items were entered at the Bell price and the appraisal coincided with the "indoor price," as to amount. The invoice accompanying entry 57–B notes certain items "For Bell Importing Company only," as to which no prices are given under column 11 "Current Price (Export) Per Unit." As to other items, a price was given under column 11 and the merchandise was appraised at that price.

During the course of the trial, Mr. Bell was questioned about a buying commission paid to Li Chung Sang, and counsel for the Government moved to strike this testimony on the ground that a buying commission is not part of cost of production. This motion was taken under advisement and is now granted. A *bona fide* buying commission is not a part of dutiable export or foreign value nor is such a commission a part of any of the elements of cost of production. *United States* v. *S. S. Kresge Co. et al.*, 26 CCPA 349, C.A.D. 39; *United States* v. *F. P. Dow, Inc., of Los Angeles, a/c Olympic Plastics Co., Inc.*, 54 Cust. Ct. 751, A.R.D. 180, and cases cited. There is nothing to show the buying commission was added to the appraised values.

At the conclusion of the case, counsel for the Government moved to dismiss on the ground that plaintiff had not met its burden of proof. This motion must be denied since the court is required by statute to find value. 28 U.S.C., section 2631; *United States* v. *Joseph Fischer et al.*, 32 CCPA 62, 67, C.A.D. 286.

This will be I believe the first reported reappaisement involving the trade in Hong Kong tailormade clothing. That trade offers difficulties both as to administrative and judicial statutory appraisement, which were devised for quite different conditions. The nature of these difficulties is plain from the very able report, exhibit A, by the then Treasury representative, Frank W. Hammar. It would be tempting to quote his findings extensively, both in substantiation of the views herein expressed and for their own intrinsic interest. The report is stripped of its confidentiality by being offered and received in evidence without restriction, but as a matter of discretion, it appears better not to expose the statements of Mr. Hammar's informants to reproduction in print and circulation broadcast. The court has, however, found the report of great value and statements herein are based on it in its entirety, as well as the oral testimony taken.

Cost of production, as defined by section 402a(f) of the Tariff Act of 1930, as amended, consists of four elements: (1) The cost of materials and labor, (2) the usual general expenses (not less than 10 percent of the cost of materials and labor), (3) the cost of all containers and coverings and other charges incident to placing the merchandise

in condition for shipment to the United States, and (4) an addition for profit (not less than 8 percent of (1) and (2)), "equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind." Constructed value, as defined in section 402(d) of said tariff act, includes similar elements, grouped under three headings, without the 10 and 8 percent minima. It has been held that, where the claimed value is cost of production, the four elements itemized in section 402a(f) must be separately shown. *Philipp Wirth et al.* v. *United States*, 23 CCPA 283, T.D. 48144; *Mrs. G. P. Snow* v. *United States*, 24 CCPA 319, T.D. 48767; *United States* v. *Malhame & Co.*, 24 CCPA 448, T.D. 48911. The same is true of the elements making up constructed value, as defined by section 402(d).

The plaintiff must show both that the appraised value is wrong and that the claimed value is correct, a twofold burden. *Brooks Paper Company* v. *United States*, 40 CCPA 38, C.A.D. 495. The stipulations show inferentially that there was no statutory foreign, export, or United States value. Therefore, presumably, and in line with the stipulation, the appraiser appraised on "cost of production" or "constructed value" according to the date of entry. He was required to show for "profit" the amount "which ordinarily is added" by producers of merchandise of the same class or kind, in the case of "cost of production," and an amount "usually reflected in sales of merchandise of the same general class or kind * * * which are made * * * in the country of exportation," in the case of "constructed value." It is an obvious inference that Bell's suppliers realized a larger profit in their sales at "indoor prices" than in their sales to Bell. There were other tailors in this type of business in Hong Kong, as exhibit A shows. The court cannot assume the appraiser's information was limited to the evidence in this case. He was required to ascertain or estimate the value "by all reasonable ways and means in his power," any statement of cost in an invoice or other document to the contrary notwithstanding. Section 500, Tariff Act of 1930. He is not required to submit to questioning in a judicial reappraisement as to what reports and other evidence he acted on.

Demonstrating a customs appraisal wrong is never easy, and it varies from moderately difficult to practically impossible, depending on the type of merchandise and the practices usual in the trade involved. The appraiser herein may have considered his best estimate of the profit ordinarily added in sales at "indoor prices" to be the profit figure to be added, not the profit in sales to Bell. Or he may

have approached his task in a wholly different manner. In any event, the evidence herein to demonstrate the appraiser wrong, as I view the case, must begin by showing that the profit figure added in sales to Bell was the profit ordinarily added, and this it fails to do. Nor does it demonstrate the corresponding fact as to the entries subject to "constructed value." Nor is it even clear what the profit was in the sales to Bell, which sales the appraiser must have considered not the proper criterion.

The importer has also failed to demonstrate that the entered values are the dutiable values of the merchandise, as it claims. The other part of its dual burden is thus also not successfully borne. The appraised values herein are stated as a conclusion and do not furnish any of the components the appraiser added together to make a whole. It follows there are no subsidiary findings as to value components which the importer can adopt in lieu of proof, while attacking others. The importer's admission is quoted above, that the supplier's alleged material costs probably were subject to deduction for unknown kick-backs. The Hammar report shows that the supposed labor costs, according to Hong Kong practice, include the material used other than the basic cloth, e.g., linings. (Costing is done in this manner in Hong Kong because the actual tailoring is commonly subcontracted out.) The overhead and profit are lost in uncertainty. Not knowing the overhead and profit, the court, in the "cost of production" entries, cannot determine if they are over or under the minimum 10 and 8 percent. Thus the court could not construct an appraisement in the manner prescribed by the statute, other than the appraised value.

Considering the issues herein from a broader view, the importer, having made a better bargain than most United States buyers of Hong Kong tailored clothing, wants the benefit of his bargain in the customs appraisement of his merchandise. The difficulty is that the Congress did not so intend. The importer may well consider his invoice values not over "cost of production" considering that his suppliers manifestly allowed themselves, in their prices to him, a profit over all costs. But "cost of production" is somewhat of a misnomer for the statutory method of appraisement involved, and this is why the name was changed to "constructed value" in the new law. The Congress intended clothing such as here involved to be appraised uniformly for the same quality and pattern imported from Hong Kong at or about the same time, no matter by whom, at what port, or at what variation up or down from any normal price. To achieve this difficult feat, the appraiser was required to gather and presumably did gather information from varied sources, not necessarily limited to the information put before this court. However, the information in the Hammar report is quite sufficient to show that Mr. Bell's transactions

with his suppliers were extraordinary, not "normal" or "usual." The report pays tribute to his skill as a bargainer and his apparent unique ability to squeeze the water out of suppliers' allegations as to their costs. Suppose the profit of these suppliers in selling to Bell could be calculated—as it could not be on the present record—this would not be the profit the Congress intended to be added in computing statutory "cost of production" and "constructed value."

On the record presented, the appraised values must be sustained.

I find as facts:

1. That the imported merchandise consists of men's and women's tailormade clothing imported from Hong Kong during 1954 through 1958.

2. That the merchandise covered by the entries made before February 27, 1958, was appraised on the basis of cost of production, as defined by section 402a(f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. That the merchandise was not on the final list, T.D. 54521, and that the merchandise covered by the entries made on and after February 27, 1958, was appraised on the basis of constructed value, as defined by section 402(d) of said tariff act, as amended.

4. That, at or about the time of exportation, such or similar merchandise was not freely sold or freely offered for sale in the principal markets of Hong Kong, in the usual wholesale quantities and in the ordinary course of trade, for home consumption or for exportation to the United States.

5. That, at or about the time of exportation, such or similar merchandise was not freely sold or freely offered for sale in the principal markets of the United States, in the usual wholesale quantities and in the ordinary course of trade.

6. That the evidence does not establish the profit added in sales to the importer was the profit ordinarily added by producers of merchandise of the same class or kind or that usually reflected in sales of merchandise of the same general class or kind.

7. That there is not sufficient evidence on which to base subsidiary findings as to the components of either cost of production, as defined in section 402a(f), or constructed value, as defined in section 402(d) of the tariff act, as amended.

I conclude as matters of law:

1. That cost of production, as defined in section 402a(f) of said tariff act, as amended, is the proper basis for the determination of the values of the merchandise covered by the entries made before February 27, 1958.

2. That constructed value, as defined in section 402(d) of said tariff act, as amended, is the proper basis for the determination of

the values of the merchandise covered by the entries made on and after February 27, 1958.

3. That said values are represented by the appraised values.

Judgment will be rendered accordingly.