(Reap. Dec. 10616)

F. P. Dow, Inc., of Los Angeles, a/c Olympic Plastics Co., Inc. *v.* United States

Entry No. 3249.

(Decided October 30, 1963)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

Donlon, Judge: The issue before the court in reappraisement is the value, based on cost of production, of a machine described as an automatic bottle blow molding machine, used in the plastics industry. This machine was manufactured in England by E. Shipton & Co., Ltd., sold to Olympic Plastics Co., Inc. (for which plaintiff F. P. Dow, Inc., of Los Angeles, acted as customs broker), shipped from

Middlesex, England, on June 14, 1957, and entered at the port of Los Angeles on July 24, 1957.

The machine was appraised on the basis of cost of production value, and that is the basis for which plaintiff contends. It may be observed, also, that the parties have stipulated in open court that such or similar merchandise was not freely offered in England for home consumption or for export to the United States, and was not freely offered for sale in the United States, at the time of exportation. I find that the basis of appraisement is properly the cost of production.

What is in issue, is the amount of the value determined by the appraiser as a computation of the cost of production. On the testimony of record, plaintiff contends that it has established the four statutory components of cost of production value, in the following amounts:

| | |
|---|---|
| Materials | $4, 760 |
| Labor | 2, 464 |
| Sec. 402 (f) (1) | 7, 224 |
| Usual general expenses Sec. 402 (f) (2) | 4, 435 |
| Costs of packing, etc. Sec. 402 (f) (3) | 560 |
| Addition for profit Sec. 402 (f) (4) | 1, 781 |
| | $14, 000 |

The merchandise was appraised at $28,000, and that is the value for which defendant contends. However, defendant has not introduced evidence establishing the several statutory components of value which would support its contention.

Plaintiff adduced the testimony of two witnesses. Mr. David Rome said that, in 1957 (the time of this importation), he was president of Olympic Plastics Co., Inc., a firm engaged in the business of molding plastic materials into various shapes. This presumably is the same concern referred to in the title of this suit and in the official papers as Olympic Plastics Co., Inc. Mr. Bernard Strong said that he had been with E. Shipton & Co. since 1934 and that, in 1957, he was a director and, as such, "was in charge of the selling of the plastics machinery and other equipment in the old country [*sic*] of the world." He said that he also was "in charge of the manufacture and cost accounting of this machinery and the production of this machinery."

Plaintiff also introduced, as exhibits, an agreement between Shipton and Olympic; purchase order for the machine of this litigation; first and second supplements to such purchase order; a memorandum of payments made by Olympic to Shipton, prepared by witness Rome;

and copies of certain bills of Shipton rendered to Olympic. In all cases where original documents were introduced, the court consented to substitution of photostatic copies. (Exhibits 1 to 6, inclusive.)

Defendant adduced no testimony and introduced in evidence a report, dated July 18, 1961, by Customs Agent Suttie. (Collective exhibit A.)

Inasmuch as plaintiff has shown by testimony of a director of the manufacturer, who was in charge of production and of cost accounting, amounts that are stated to represent the prescribed components of cost of production value of this machine, viz, the cost of materials and of fabrication, the usual general expenses, the cost of containers and packing, and the usual addition for profit, I can not agree with defendant's contention that plaintiff has failed, either, to overcome the presumption of correctness attaching to the appraisement or to show a claimed cost of production value. Plaintiff has made a *prima facie* case. The question is, has defendant rebutted this, either by the proofs it introduced or by testimony elicited on cross-examination of plaintiff's witnesses.

The report of Customs Agent Suttie (exhibit A) does not at any point refer to cost of production value. It discusses the purchase price. It mentions an allegation that the "molds" were invoiced at 25 per centum of true purchase price. It analyzes parts of an agreement (not attached to exhibit A, although it is stated therein that it is attached), alleged to disclose "that the fully automatic bottle blowing machines would be sold at a value of 28 thousand dollars, FOB factory each, which value would include the license fee." The agent's report considers the dutiability of this "license fee," and states that "it has been determined that the license fee in each case was a license fee paid to operate and use the machines and as such is *one of the elements of the cost of ownership*, as is cited in C.A.D. 42. Therefore, *the license fee is considered to be dutiable*." [Emphasis supplied.]

The report (exhibit A) also states that "it is believed that the violation in this case is of such a serious nature as to warrant action under Part II, page 4, B2 of BCLX203. The penalty under section 592 of the Tariff Act, will make possible the recovery of the actual loss of revenue and will act as a deterrent to any similar violations." Of course, such statements have no relation whatsoever to cost of production value, but may throw light on the background of this litigation.

Although counsel for defendant stated that he would like to produce Mr. Suttie to testify, it seems that Mr. Suttie was not called.

The agreement discussed by the customs agent is before me, having been put in evidence by plaintiff. (Collective exhibit 1.) There are

17 numbered paragraphs, relating to various aspects of an agreement to license "sole and exclusive" use of a patented process in 11 enumerated Western States, and of the machine "purchased from the Licensor [Shipton] in carrying out the said process, as well as the exclusive permission to use the Licensor's method of printing for printing hollow articles made by" Olympic "under this license," with specified exceptions and limitations, together with a nonexclusive license "to sell the hollow articles manufactured by the Licensee [Olympic] hereunder anywhere in the United States whatsoever or in any foreign country where no person, firm or corporation has been granted an exclusive license by the Licensor."

There are other provisions, among them an agreement by Shipton to send an engineer to Olympic's "works to assist the Licensee in carrying out the process and operating the machine in an efficient manner."

Besides a royalty of 2 per centum "of the ex-works price of all hollow articles sold or otherwise put into use by the Licensee under the license" granted, with minimum royalties prescribed for stated years, the agreement covered one semiautomatic machine that was ordered for immediate delivery. This is not the machine here in issue. This machine is fully automatic, and was purchased under the provisions of paragraph 13 of the agreement, which reads as follows:

IN the event that the demand for hollow articles within the said territory should increase to quantities profitable to Licensee sufficient to warrant the installation of fully automatic machines in the Licensee's plant the Licensee will purchase and Licensor will sell to Licensee such a fully automatic machine from the Licensor at the price of twenty eight thousand Dollars ex-works the price being subject to any increase of cost in labour or raw material which may occur between the date of this Agreement and the date on which the order for such fully automatic machine is placed.

Witness Rome testified, and his testimony was corroborated by witness Strong, that, as the result of subsequent negotiation, the price at which fully automatic machines were purchased was reduced to $14,000.

Having already found that plaintiff has overcome the presumption that the appraisement was correct and has also made a *prima facie* case for the claimed value, consideration is now given to defendant's argument that the claimed value is incorrect.

First, defendant argues that plaintiff's computation of value is inaccurate, based on Mr. Strong's own testimony. This argument appears to rest on the assumption that 180 per centum added as general expenses (the second of the four statutory components) was 180 per centum applied to the sum of the costs of materials and labor.

While there is some confusion in the testimony at a point, the witness categorically stated that the addition to overhead was based on labor cost alone. The testimony of record is as follows:

Q. One hundred eighty per cent of what?—A. Of the labor cost. [R. 63.]

And later:

Q. Now will you proceed? What was your factory burden or overhead?— A. That was 180 per cent.

Q. Of what?—A. Of the labor.

Q. That came to what?—A. In dollars, $4,435. [R. 75.]

Witness Strong had already testified that "the materials of the automatic machine were $4,760" and the labor cost was $2,464. (R. 74.) Simple arithmetic computation verifies that 180 per centum of $2,464 is $4,435.

Defendant's second argument is that cost of production, as to which witness Strong testified, covered both patented and non-patented machines. Certainly, there was such a running fire of interruption and discussion by counsel as to confuse, at times, even an American witness, let alone one from a foreign country less accustomed to the ways of American lawyers. However, here again there is a fairly clear statement.

After an interruption by defense counsel, witness Strong made the following statement:

A. * * * You are asking me for two different things. You are asking me for the automatic here, and I gave you equivalent of dollars to pounds. This is for the semi-automatic I have the figures here. If I can go back, your Honor, to the materials of the automatic machine were $4,760, and you asked me for the figures in pounds, and it was 1,700 pounds. [R. 74.]

It seems evident Mr. Strong's testimony was that the cost of the materials "of the automatic machine," which the instant machine is, was $4,760 or £1,700.

Defendant makes no argument as to the adequacy of the profit factor. Indeed, defendant's own finding contradicting the general expense factor, accepts 10 to 15 per centum as the usual addition for profit, in this case, 14.6 per centum, as witness Strong testified.

Sales price, cancellation fees, license fees in a country other than the country of production, and other like items as to which defendant rigorously cross-examined plaintiff's witnesses, are not shown to affect the cost of materials, labor, or overhead.

Whether or not the fee paid to an English manufacturer by an importer into the United States of a patented machine manufactured in England, for a license such as is described in the underlying contract (exhibit 1), enters into the cost of producing the machine in England, is an issue as to which both parties, in their briefs, discuss three cases.

In *United States* v. *F. B. Vandegrift & Co. et al.*, 26 CCPA 360, C.A.D. 42, the question was whether the cost of production of certain machines, manufactured in Germany, included a license fee paid for the exclusive right to purchase the machines. The court of appeals held it did not include this license fee. That is the *holding* of the *Vandegrift* case.

In the course of his opinion, in discussing purchase price, but not when he discussed the cost of production based on statutory factors, Judge Hatfield said:

> If it appeared from the evidence of record that the importer paid $1,800 per machine, plus $1,200 per machine for the right to their use, we would be compelled to hold that, as the right to use is one of the elements of ownership (*Billings* v. *United States*, 232 U.S. 261, 280), the so-called license fees were a part of the purchase price. [P. 364.]

The *Billings* case, cited, *supra*, had to do with an excise tax levied on the use of a foreign-built pleasure yacht, by its citizen owner in territorial waters. Careful reading discloses that the price paid for the yacht did not enter into the opinion of the highest Court, nor was there any suggestion that a license fee had been paid to any one abroad for use of the yacht. The "license" in question was an excise levied by the Congress on use of a foreign-built pleasure yacht in United States waters, and that excise was upheld as constitutional by our Supreme Court. The *Billings* case has no particular relevancy to the issue that confronts me here, namely, what was the foreign manufacturer's cost of production, computed under a statutory formula, of a machine manufactured in the country from which it was exported to the United States.

A second case cited in both briefs is *United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, 39 CCPA 86, C.A.D. 468. There, it was held that a license fee paid for the exclusive right to purchase certain machines for export to the United States, is not a part of cost of production.

In *United States* v. *Pacific Customs Brokerage Co. et al.*, 32 Cust. Ct. 675, A.R.D. 44, it appeared that, in addition to the purchase price, the American importer had contracted to pay a sum in consideration of a license to use the patent rights, plus royalties. The issue was cost of production, as here. The court found that the license fee and the royalties were not part of the cost of production. The court also said that they were not part of the purchase price. Although not directly so stated, it might appear that the latter finding negatived any argument that these fees were an element of the addition for profit, in computing cost of production, under the facts of the *Pacific* case.

Other cases in which license fees and royalties for exclusive rights, paid by the purchaser to a foreign manufacturer, have been held not

to be a part of the cost of production, include *Brauner & Co.* v. *United States*, 44 Cust. Ct. 661, Reap. Dec. 9673, and *United States* v. *Henry A. Weiss, Inc.*, 48 Cust. Ct. 700, A.R.D. 142.

There is little argument, and no citation of authority, that the charge paid for canceling the contract to purchase additional machines, is a part of the cost of producing the machine that was purchased.

Indeed, I am cited to no case in which it has been held that a fee paid for a license to use a machine in the United States, or a penalty paid for canceling a contract to purchase machines, is a cost of producing the machine in the foreign country. They are not a cost of materials, nor of labor, nor of packing. They do not appear to be a part of the general expenses of producing the machine. Whether, in a particular case, they may enter into computation of the usual addition for profit, and to what extent, is not shown here and cannot be presumed on the record before me.

I find as facts:

1. That the merchandise herein is a fully automatic bottle blow molding machine, manufactured and exported from England by E. Shipton & Co., Ltd., on or about June 26, 1957.

2. That the machine was involved and entered at $14,000; and it was appraised on the basis of cost of production at $28,000, which included the $14,000 invoice charge and $14,000 represented as a license fee.

3. That such or similar merchandise was not freely offered for sale in the foreign market for home consumption or for export and was not freely offered for sale in the United States.

4. That, prior to this importation, the manufacturer (as licensor) and Olympic Containers, Inc. (as licensee), entered into an agreement, dated January 16, 1956, which provided for purchase of a semiautomatic machine (not the machine of this suit), including an exclusive license in certain enumerated Western States, to use the licensor's process for manufacture of hollow articles, together with the sole and exclusive license to use the said semiautomatic machine in carrying out the process, together with the exclusive permission to use the licensor's method of printing hollow articles. The agreement also provided that the licensor would furnish to the licensee full technical information as to the process and the machine and the licensor's method of printing.

5. That the agreement provided (clause 13) that, should the demand for hollow articles increase sufficiently to warrant the installation of fully automatic machines, the licensee would purchase and the licensor sell such a machine at the price of $28,000; and this price was subsequently reduced by negotiation to $14,000.

6. That, at and prior to the date of exportation, the cost of producing such fully automatic blow molding machines was:

| | |
|---|---|
| Cost of materials | $ 4,760 |
| Cost of labor | 2,464 |
| Overhead (180 percent of the cost of labor) | 4,435 |
| Packing | 560 |
| Addition for profit (14.6 percent) | 1,781 |
| | $14,000 |

I conclude as matters of law:

1. That the cost of production, as that value is defined in section 402(f) of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, is the proper basis of appraisement of the machine in issue.

2. That the cost of production of the instant machine is $14,000, net, packed.

Judgment will be entered accordingly.