(Reap. Dec. 10660)

THE A. W. FENTON CO., INC. v. UNITED STATES

Entry No. 3182.

(Decided January 14, 1964)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff. *John W. Douglas*, Assistant Attorney General (*Morris Braverman*, trial attorney), for the defendant.

WILSON, Judge: This is an appeal for reappraisement of the value of a so-called electroplating plant inventory, consisting of a variety of articles, including an electroplating machine and its parts, other machines, and various other articles, and certain chemicals, chemical compounds, and solutions used in an electroplating process.

The merchandise was exported on April 24, 1959, by Sifco Meta-chemical, Inc., Toronto, Canada, to Sifco Metachemical, Inc., Cleveland, Ohio. Entry of the goods was made by the plaintiff, customs broker, at its gross invoice price of $47,858.50 (Canadian), plus an addition of $32, "making the entered value $47,890.50, which was equal to $49,509.77 in United States currency" (R. 3). Appraisement was made on the basis of "constructed value," section 402 (d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at "invoiced unit values, except as noted, in Can.$, plus 381.95% packing included." The record discloses that, except for some "minor changes," the appraiser accepted the invoice price as the *per se* value and that the addition of 381.95 per centum was due to the inclusion in the appraised value of certain "license rights," amounting to the sum of $183,131.70, which action by the appraiser, it appears, forms the basis of the present controversy. The importer concedes that constructed value is the proper basis of appraisement (R. 4), but contends that the entered value represents the constructed value of the importation at bar.

Section 402 (d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, reads as follows:

(d)  CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1)  the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2)  an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3)  the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

The record in this case consists of the testimony of two witnesses called by the plaintiff, supplemented by certain documentary exhibits, hereinafter noted.

Plaintiff's exhibit 1 is an offer, dated February 4, 1959, by The Steel Improvement & Forge Co., Cleveland, Ohio, and acceptance, dated February 12, 1959, by Dalic Metachemical, Ltd., Toronto, Canada, for

the purchase of the machinery, equipment, and other items under consideration, and, in addition, certain license rights and accounts receivable. Schedule A of said exhibit 1 refers to an agreement (plaintiff's exhibit 2), dated November 29, 1954, between Dalic Metachemical, Ltd., on the one part and two other persons, namely, Herbert Denis Hughes and Jean Jacques Georges Icxi, the latter persons being the owners of certain patent rights having to do with plating processes, hereinafter described as "Dalic processes." Under said agreement, Herbert Denis Hughes and Jean Jacques Georges Icxi granted to Dalic Metachemical, Ltd., "the exclusive right and license within Canada to use the Dalic patents and the Dalic processes and all other patents, patent rights, and licenses from time to time owned by either of the licensors" (page 4, plaintiff's exhibit 2). It was this subject matter of plaintiff's exhibit 2 which subsequently became a part of the offer made by The Steel Improvement & Forge Co. and the acceptance of same by Dalic Metachemical, Ltd. (plaintiff's exhibit 1), as above noted.

Plaintiff's exhibit 3, hereinafter referred to, is a supplementary agreement, dated August 1, 1955, between Dalic Metachemical, Ltd., and Herbert Denis Hughes and Jean Jacques Georges Icxi, whereby the latter persons designated as licensors granted to Dalic certain patent rights and licenses as to the use of the Dalic processes within the United States.

Plaintiff's exhibit 4 (R. 49) is an offer of sale, dated February 27, 1959, made by The Steel Improvement & Forge Co. and an acceptance by Sifco Metachemical, Inc., Cleveland, Ohio. By virtue of said offer and acceptance, the machinery and equipment, inventories, and trade accounts receivable of Dalic Metachemical, Ltd., of Canada, together with the benefits of the license agreements that Dalic had with Messrs. Icxi and Hughes, were assigned to Sifco Metachemical, Inc. These items represent the transaction directly resulting in the importation now before the court.

Mr. John D. Robison, appraiser of merchandise at Cleveland, who made the appraisement in this case, testified that the addition of 381.95 per centum to the entered value represented "a charge made for certain license rights to employ a process for which the imported machinery was exclusively used" (R. 8); that the amount of $183,131.70 was 381.95 per centum of the invoice value (R. 10); that the 381.95 per centum addition represents the license rights shown in plaintiff's exhibit 1 (R. 12); that the basis of appraisement was constructed value and that he considered the license rights to be part of the constructed value (R. 12–13). He could not state under which part of "constructed value" he included the license rights, stating that he arrived

at the appraised value by employing "all reasonable ways and means" under section 500(a)(1) of the tariff act, as amended (R. 16, 17, 18, 28, 29, 35, 36, 37). The witness further testified that "We accepted the price that was shown on the invoice as an indication of the value of the used machinery" (R. 26). He further stated that "The license rights in the instant case were considered as an element of ownership, and therefore included in the appraised value" (R. 30, 32).

Plaintiff's second witness was Brooks W. MacCracken, presently counsel and secretary for The Steel Improvement & Forge Co., into which Sifco Metachemical was merged in September 1962. He testified that he was the one who negotiated and prepared the agreements under which the merchandise in question was acquired and ultimately brought into this country (R. 41).

Plaintiff, in the case at bar, accepts all elements entering into the appraisement, except the addition of 381.95 per centum for the license rights. It is settled law that an appraisement is severable and that a plaintiff may challenge one or more elements of an appraisement and rely upon the presumption of correctness as to all other elements. *United States* v. *Fritzsche Bros., Inc.*, 35 CCPA 60, C.A.D. 371. Accordingly, the sole question here for determination is whether the inclusion in the appraised value of certain "license rights," amounting to $183,131.70, was proper. In this connection, plaintiff, in its brief, directs attention to certain decisions of this and our appellate court claimed to be pertinent in our present determination.

In *United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, 39 CCPA 86, C.A.D. 468, the involved merchandise consisted of four so-called transkrit machines or printing presses, exported from Switzerland. The sole manufacturer of the machines was a German corporation, which manufactured the machines upon orders from the Swiss concern which obtained the four machines by shipment from the manufacturer for transshipment to the importer. In payment for said machines, the importer remitted the sum of 88,000 RM direct to the manufacturer in Germany, of which sum the amount of 40,000 RM was transmitted to the foreign vendor in payment for certain exclusive territorial rights granted the importer. In holding that the license fee in question was not a proper item to be included in computing the value of the merchandise, the court, in the *Hensel, Bruckmann*, case, *supra*, page 90, stated:

We conclude that there is substantial evidence of record to establish that the machines in issue were manufactured by the German corporation hereinbefore described and that the cost of production of each involved machine was 12,000 RM and that the license fee in issue was paid in consideration of the exclusive right to purchase the involved machines for export to the United States. Hence the license fee is not an element which may be properly added in computing the

dutiable value of the merchandise on the basis of cost of production. *United States* v. *F. B. Vandegrift Co., et al.*, 26 C.C.P.A. (Customs) 360, C.A.D. 42; *United States* v. *Alfred Dunhill of London, Inc.*, 32 C.C.P.A. (Customs) 187, C.A.D. 305.

To like effect was the holding of the court in the case of *United States* v. *Pacific Customs Brokerage Co. for Munising Wood Products Co., Inc.*, 32 Cust. Ct. 675, A.R.D. 44.

In *United States* v. *Tide Water Oil Co.*, 19 CCPA 392, T.D. 45554, the merchandise involved consisted of an oil-refining plant, which it appeared was constructed and designed for the purpose of refining distillates of petroleum by a patented chemical process. The contract, under which the merchandise was purchased by the appellee therein, involved the purchase of the said plant and also a license to appellee to use the chemical process in the United States, covered by United States patents and applications for patents. Paragraph 6 of said contract read as follows:

6. The licensee guarantees and agrees to pay to the licensor a minimum sum of $20,000 in U.S. gold per annum for a period of five years from the date of the completion and placing in commercial operation of the plant to be furnished and erected as hereinafter provided; *. * *.

The court, in the *Tide Water Oil* case, *supra*, held that the aggregate amount of $100,000 provided for by said paragraph 6 of the contract under consideration did not constitute a part of the purchase price of the involved merchandise, stating, in this connection, pages 396–397, as follows:

Appellee contends * * * that the $20,000 per annum for five years set out in paragraph 6 of the contract should not be added to the invoice value to make dutiable value because, as it interprets the said contract, this sum represented a payment on account of royalties for the use of the patented process, and was not to be a payment upon the plant. * * *

\* \* \* \* \* \* \*

Said paragraph 6 of the contract is found in that part of the document relating to the license granted to appellee to use the patented process therein referred to, and it was clearly intended that said $100,000 provided for therein was to be compensation to the seller for the right to use the patented process and did not in any way relate to the right to use the plant purchased. * * *

\* \* \* \* \* \* \*

We are of the opinion that the $100,000 provided for by said paragraph 6 is a minimum-royalty provision, in part payment of the right to use the patented process, and that the payment thereof was to accrue after appellee had acquired title to the plant and had erected the plant in the United States.

In *United States* v. *F. B. Vandegrift Co. et al.*, 26 CCPA 360, C.A.D. 42, the merchandise consisted of three machines for use in the manufacture of glass ampoules, the purchase price of which was $1,800 each. The importers also paid to the manufacturers an addi-

tional $1,200 per machine as a so-called license fee for patent and exclusive selling rights in the United States. The record showed that the license fees were paid in consideration of the exclusive right to purchase the involved and like machines for export to the United States and the exclusive right to manufacture and sell machines like those there involved both in the United States and Canada, and that neither the owner nor manufacturer was to receive royalties on the products produced by such machines. The court thereupon concluded that there was substantial evidence of record to establish that the purchase price of the involved machines was $1,800 each, ruling, in effect, that the payment for the license fees was not a part of the value of the machines there under consideration. In my opinion, a parallel situation to that which obtained in the cases above cited exists in the case at bar, as will be more fully indicated in the discussion of the documentary exhibits in evidence, which are discussed below.

The license agreements, as set forth in plaintiff's exhibits 2 and 3, indicate the basis and origin of the subject matter of the present controversy. Under the license agreement, dated November 29, 1954 (plaintiff's exhibit 2, page 4), Dalic Metachemical, Ltd., was granted "the exclusive right and license within Canada to use the Dalic patents and the Dalic processes * * * and the exclusive right and license within Canada to import, distribute and sell the Dalic materials" and (b) (1) "* * * the exclusive right to manufacture the Dalic materials for distribution and sale in Canada and the United States of America * * *"; subject to the payment by Dalic Metachemical, Ltd., to the licensors or their nominees or assignees "upon any sale by the Company of units of the tampon described in patent No. 493784 * * * and of any solutions heretofore developed for use in conjunction with such tampon and now in such use commercially of a sum by way of royalty equal to such percentage * * * of the net selling price * * * ex-works obtained thereon by the Company as the Company and the Licensors may hereafter agree." Patent No. 493784, referred to above, is described in plaintiff's exhibit 2, page 1, as being "granted under the Patent Act of Canada on June 23, 1953, describing a plating process."

Plaintiff's exhibit 2, pages 3–4, states: " 'Dalic materials' means and includes all equipment, appliances, tools, solutions, mixtures, formulae, and other tangible items from time to time involved in or required for the application of the Dalic processes." As indicated by the agreement, dated August 1, 1955 (plaintiff's exhibit 3, page 4), Dalic Metachemical, Ltd., was granted "the exclusive right and license *within the United States of America* its territories and possessions to use the Dalic patents and the Dalic processes and all other patents, * * * from time to time owned by either of the Licensors * * * and useful in connection with the Dalic *processes*" and "the exclusive right and

license *within the United States of America* its territories and possessions to *import, distribute and sell* the Dalic materials." [Italics supplied.]

The subject matter of plaintiff's exhibit 4, heretofore referred to, covers "the machinery and equipment, inventories and trade accounts receivable of the Canadian company, together with the benefits of two license agreements it has with Messrs. Icxi and Hughes, and whereby (2) we have made arrangements for the sale and transfer * * * of 139,630 shares in the Canadian company and the rights of the licensors under and on account of the aforesaid license agreements with the Canadian company" (page 1, second paragraph, plaintiff's exhibit 4). Under this assignment by Dalic Metachemical, Ltd., reference is separately made to the "machinery and equipment, inventories and trade accounts receivable of the Canadian company," followed by a reference to the license agreements. I am of opinion that a proper construction of this offer and acceptance indicates that the purchase of the machinery and equipment, and inventories, which items constitute the imported merchandise, was separate and apart from the benefits conferred under the license agreements which, I am persuaded, had to do only with the right to employ certain patent rights and processes.

While it is true, of course, that the said machinery and equipment were to be used in connection with the processes and patents owned or to be acquired by Dalic Metachemical, Ltd., this fact does not by itself establish that the sale of the said machinery and equipment was only by virtue of a power conferred under the license agreements or that the license agreements themselves were intended to and did grant the *right* to *use* the machinery and equipment for the patented Dalic processes. Rather, an examination of the contract, entered into between The Steel Improvement & Forge Co. and Dalic Metachemical, Ltd. (plaintiff's exhibit 1, page 2), indicates, in my opinion, that the subject matter of said contract concerned three separate items, viz, (a) machinery and equipment and inventories on hand; (b) certain license agreements and trademarks (schedule A, plaintiff's exhibit 1) ; and (c) the trade accounts receivable of Dalic Metachemical, Ltd. A separate itemization for the sale of the machinery and equipment and inventories of Dalic Metachemical, Ltd., is set forth in the contract (exhibit 1, page 2) as follows: III(a) "for the assets described in paragraph II(a) above a sum equal to the net book value thereof as hereinafter determined." Title to the machinery and equipment of Dalic Metachemical, Ltd., passed to the purchaser under the contract (plaintiff's exhibit 1) upon separate payment of the agreed upon purchase price, independently of the rights conferred under the license agreements, which were but part of the assets embraced under the

contract of sale between Dalic Metachemical, Ltd., and The Steel Improvement & Forge Co.; and which license rights were for the exclusive right to use certain patented plating *processes* in Canada and the United States, as well as the exclusive right to import, manufacture, distribute, and sell the Dalic materials in Canada and the United States, and also to use the Dalic trademark in those countries. The license rights for the use of the patented processes were obtained by payment of the license fees. These license fees constitute no more a part of the value of the imported merchandise than does the amount paid for the "accounts receivable," also separately covered in the contract of sale between Dalic Metachemical, Ltd., and The Steel Improvement & Forge Co., by which the machinery and equipment, the license rights, and the accounts receivable were acquired. Accordingly, in my opinion, the license fee paid by the importer for the license rights to use certain patented processes was improperly included as part of the constructed value of the imported merchandise.

On the basis of the record here presented, I find as facts:

1. That the involved merchandise consists of machinery and equipment, chemicals, chemical compounds, and other articles comprising the inventory of an electroplating plant, exported from Canada on or about April 24, 1959.

2. The merchandise was appraised on the basis of constructed value, as that value is defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. That the imported merchandise does not appear on the so-called final list, published by the Secretary of the Treasury, pursuant to section 6(a) of the Customs Simplification Act of 1956, T.D. 54521.

4. Appraisement of the merchandise was made at invoiced unit values, except as noted by the appraiser, in Canadian dollars, plus 381.95 per centum, packing included.

5. The addition by the appraiser of 381.95 per centum represents the amount of $183,131.70 paid by the importer for certain license rights to use certain patented processes and trademark, and payment of said license fees was not made for the right to use the machinery and equipment and other articles here imported.

6. That said sum of $183,131.70 formed no part of the purchase price or constructed value of the imported merchandise.

I conclude as matters of law:

1. Constructed value, as that value is defined in section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise in question.

2. That such constructed value is the appraised value, less $183,131.70.

Judgment will be rendered accordingly.