(R.D. 11231)

CAVALIER SHIPPING Co., INC.
SODERHAMN MACHINE MANUFACTURING Co. } *v.* UNITED STATES

Entry Nos. N–135; 1135.

(Decided October 19, 1966)

*Sharretts, Paley & Carter* (*Eugene F. Blauvelt* of counsel) for the plaintiffs. *J. William Doolittle*, Acting Assistant Attorney General (*Charles P. Deem* and *Harry A. Isaacs*, trial attorneys), for the defendant.

FORD, Judge: The above appeals for reappraisement, consolidated for the purpose of trial, cover certain incomplete debarking machines which were appraised under section 402(f), cost of production, or 402(d), constructed value, Tariff Act of 1930, or as amended by the Customs Simplification Act of 1956, Public Law 927, 84th Congress, 91 Treas. Dec. 295, T.D. 54165, depending upon the date of entry. There is no dispute either as to the basis of appraisements, plaintiffs having conceded this in its statement filed pursuant to rule 15 of the Customs Court, or the appraised value in Swedish crowns.[1] The portion of the appraisement utilizing the Swedish crowns is the actual invoiced unit values. The dispute arises only with respect to an addition of a sum in United States dollars, which allegedly represents a royalty for each machine, which sum was obtained from the books of the importer.

The pertinent portions of the statutes involved herein are as follows: Section 402, Tariff Act of 1930:

(f) COST OF PRODUCTION.—For the purpose of this title the cost of production of imported merchandise shall be the sum of—

(1) The cost of materials of, and of fabrication, manipulation, or other process employed in manufacturing or producing such or similar merchandise, at a time preceding the date of exportation of the particular merchandise under consideration which would ordinarily permit the manufacture or production of the particular merchandise under consideration in the usual course of business;

(2) The usual general expenses (not less than 10 per centum of such cost) in the case of such or similar merchandise;

.(3) The cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the particular merchandise under consideration in condition, packed ready for shipment to the United States; and

(4) An addition for profit (not less than 8 per centum of the sum of the amounts found under paragraphs (1) and (2) of this subdivision) equal to the profit which ordinarily is added, in the case of merchandise of the same general character as the particular merchandise under consideration, by manufacturers or producers in the country of manufacture or production who are engaged in the production or manufacture of merchandise of the same class or kind.

---

[1] Swedish crowns is the English translation of Swedish kronor and both terms are used interchangeably in this decision since the record and exhibits utilize both forms.

Section 402, as amended, *supra:*

(d) CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount of general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

The sole issue presented deals with certain royalties provided for in an agreement entered into between the manufacturer, the parent corporation of the importer, and the inventors.

The invoices and entry papers in each of the two appeals were received in evidence. Plaintiffs called the sole witness, Mr. Gus Jacobson, the president and general manager of the importing company since its incorporation. The witness was familiar with the merchandise involved in both appeals, with his company's accounts, and with the royalty agreement entered into between the exporter and the debarking machine inventors. Plaintiffs' exhibit 1, the affidavit of one Lars Dalman, president and general manager of the Swedish export company since 1941, was also received in evidence. The affidavit, executed and sworn to before the American Consul in Stockholm, states that Mr. Dalman was familiar with the machines involved in these appeals. He is also acquainted with his firm's accounting system and records. The record also contained defendant's collective exhibit A, United States Treasury Department Report No. 3–703/821, prepared for the commissioner of customs by Arno Hellthaler, Treasury representative in Frankfurt, Germany. The report discloses an interview with Mr. Lars Dalman and Mr. Goesta Wirtavouri, the latter being the sales manager of the Swedish export firm. Mr. Wirtavouri furnished Mr. Hellthaler with information verified by the exporter's books of account and other records. Also received in evidence was defendant's collective exhibit B, report No. 3–17, prepared for the commissioner of

customs by William P. Hunton, customs agent in charge, Mobile, Ala. The information contained in this report, was furnished by Mr. W. R. Meehan, comptroller of Soderhamn Machine Manufacturing Co., the importer. The report purported to be an up-to-date indication of royalty payments made, pursuant to an agreement between the Swedish manufacturer and the debarker inventors, on each imported machine that had been sold by the importer.

Reappraisement R61/12950 involves six machines invoiced at a unit price of 29,968 Swedish kronor, plus packaging and delivery charges. The machines were appraised at the invoice value with addition in United States dollars of $1,448.20 each. The serial numbers corresponding to these six identical Cambio debarkers were 58836 through 58841. Reappraisement R61/12951 involves two Cambio debarkers invoiced at 56,717.50 Swedish kronor each. These two identical machines were appraised at their invoice prices, plus an addition in United States dollars equal to $1,648.86 in the case of the machine corresponding to serial number 60505, and $1,479 in the case of the debarker bearing serial number 60506. The invoice prices for both shipments did not include royalty payments. The six machines comprising the earlier of the two importations were the "Cambio 35 Debarkers," while the two machines imported later were designated as "C–66 Cambio Barkers," both models being basically the same, the latter however, being larger. Both models of the debarker are imported into the United States in an incomplete state, containing some components manufactured in the United States and installed in Sweden prior to export. The machines were completed in the United States at the Soderhamn Machine Manufacturing Co. plant by the addition of components manufactured in the United States. The costs incurred by the American firm in completing these machines vary from approximately $1,500 to $2,000 per machine, in the case of the smaller debarker, and from $2,000 to $3,000 in the case of the larger machine. The costs to complete the machines could not be stated with greater exactitude since the cost of providing servicemen necessary to each machine's installation varies depending on the distance between the central place of employment and the site of the installation.

The importing firm manufactures sawmill machinery, including debarking machines. It has been engaged in importing unfinished Cambio debarkers since 1955 and, in addition, wholly manufactured at its own plant certain Andersson debarkers, which were simultaneously being manufactured abroad by the Swedish exporter.

The importer does not resell the Cambio debarkers in their incomplete state. Resale of the machines in the United States is not restricted by the exporter, and the importer sets the United States

selling price. The Swedish exporter owns a controlling interest in the outstanding capital stock of the importing corporation. The importer in turn was given the exclusive right to import the parent company's manufactures into the United States. The method in which the importer has done business with the exporter has been basically the same throughout the period in which Cambio debarkers have been imported by Soderhamn Machine Manufacturing Co. While both shipments involved in this case were received in the importer's usual course of business, the exporter's sales practice in use and employed at the time of the earlier of the two importations was consignment of the machines to the importer, whereas the latter shipment was sold outright to Soderhamn Machine Manufacturing Co. The business relationship existing between the importer and exporter has been described by the importer's president as a close one.

Inquiry by a Treasury representative disclosed agreement as to the figures on a special customs invoice, dated January 21, 1958, and figures on the exporter's commercial invoice and records. The affidavit of Lars Dalman states that the exporter uses the identical cost accounting system and method in arriving at the invoice prices for the machines exported to the United States and those intended to be sold in Sweden and countries other than the United States. The affiant also stated that no amount of royalty has ever been considered by his firm in arriving at the factory price for which it sells Cambio debarkers, either for consumption in Sweden or for exportation to the United States or other countries. An open account card is kept by the exporter to record transactions with the importer. Payments by the importer are made at irregular times. Treasury Representative Hellthaler reported that the account maintained by the Swedish firm contained a debit for the amount indicated on the 1958 invoice and did not reveal any transfer of funds which might represent additional compensation for the merchandise exported to Soderhamn Machine Manufacturing Co. Between 1955 and the time of trial, approximately two hundred Cambio debarking machines had been imported into the United States by Soderhamn Machine Manufacturing Co.

There are three Swedish companies other than the Soderhamn firm that manufacture debarking machines of the same general class as the Cambio debarker; their share of the total debarking machine production of Sweden from 1956 to the date of trial is estimated by Mr. Dalman to be less than 10 percent while the remainder was manufactured by his firm. Cambio debarkers were first manufactured by the Swedish exporter at the end of 1955; previously that firm had manufactured the Andersson debarker under patents assigned by one, Andersson. The Cambio debarker was designed by Andersson in collaboration with two other individuals, Brundell and

Jonsson. The patent assignment contract refers to the inventors in the following terms: "* * * Erland Andersson, manufacturer, Gunnar Brundell, engineer, and Karl-Erik Jonsson, works foreman * * *." No further indication is given of their relationship to the company, aside from that arising under the royalty contract.

When the agreements covering royalties on the Cambio debarkers were executed on April 28, 1955, Söderhamns Verkstäder Aktiebolag was assignee of the patents. In the 1955 agreement, Andersson, Brundell, and Jonsson, the inventors and assignors, waived their rights to royalties payable under the Andersson debarker agreement of 1951.

The importer was not a party to the 1955 agreement which purported to have all Cambio debarker patents, pending or in force, assigned to the Swedish manufacturer. There was never any contract between the inventors and the importer. Mr. Dalman's understanding of the 1955 agreement is that it resulted in an acquisition by his firm of the rights to manufacture, use, and sell the debarkers, and that his firm acted merely as agent in remittng royalties to the inventors.

The 1955 agreement between Andersson, Brundell, Jonsson and the Swedish company provided, insofar as is pertinent, as follows:

The royalty under this agreement was to be 15 percent of the net invoice price (i.e., total, less freight, insurance, warehousing, forwarding, customs duties, agent's commission, sales tax, etc.) of all barking machines invoiced from the effective date of the agreement until its termination. In the case of sales by the United States subsidiary, the importer in this case, the royalty was to be 15 percent of the net amount of the Swedish company's invoices for a corresponding number of machines sold in a corresponding period to purchasers in Sweden. Royalties were to be paid for each 3-month period not more than 2 months after the expiration of that particular calendar quarter. There was provision for commencement of negotiations to decrease royalties in the event that competition resulted in a reduction of profits to the point where the subsequent manufacture of debarking machinery would no longer yield a reasonable profit. The inventors were guaranteed a minimum royalty of 105,000 Swedish kronor per full calendar year up to 1959, should the contract remain in effect that long. The company was entitled to terminate the agreement at any time provided it gave 24 months' notice. Otherwise the agreement was to remain in effect as long as the company held valid Swedish patents which were the subject of this agreement and protected significant parts of the debarking machines.

On April 28, 1955, Brundell and Jonsson entered into a second agreement with the Swedish exporter concerning the design and development of the debarking machines to which the first royalty agreement applied. Brundell and Jonsson were to receive an additional 5 per-

cent of the net invoice value of barking machines invoiced by the company during the period in which this second agreement remained in effect. The method of payment and the basis for calculating this royalty were identical to the corresponding provisions in the earlier agreement executed on that same day. Under the agreement, which was to remain in effect until 1957, at which time it became renewable a year at a time in the absence of notice to terminate by either party, the inventors would bear the cost of the development and designing.

Both agreements of April 28, 1955, remained in effect until April 1, 1961, although the percentage of sales price that constituted the royalty was varied from time to time. On February 22, 1959, Mr. Dalman addressed to Andersson, Brundell, and Jonsson a confirmation of an agreement changing the rate of royalty and appropriating an allowance for the inventors' design and development work. The confirmation indicated that as of October 1, 1958, the new royalty for debarking machines sold by the United States subsidiary would be payable at a rate of 6 percent of their United States net invoice price. In addition, provision was made to grant each of the three inventors a development allowance of 50,000 Swedish kronor exclusive of any personal remuneration.

From the testimony of Mr. Jacobson and the affidavit of Mr. Dalman, it appears that the patents in effect in Sweden and the United States did not provide the anticipated protection against competition. As a result, the United States importer was forced to settle certain patent conflicts. The parent company subsequently agreed to absorb all royalties accumulated on the importer's books, and the latter was thereby excused from liability to Brundell and Jonsson on the machines imported into the United States. On November 14, 1961, a resolution adopted by the board of directors of the Swedish firm relieved the United States subsidiary of its obligation to pay royalties on debarking machines and determined that these costs would be carried by the parent company in the future. In a release dated February 13, 1962, Brundell and Jonsson agreed that they had no claims against the United States importer for royalties on Cambio debarkers.

In 1956, the time of the earlier of the two shipments involved in this case, the practice was for the parent company to notify the importer of the specific amount which the latter was to enter on its books as a liability to the inventors. It was conceded by plaintiffs' attorney that the amounts so designated by the Swedish company were arrived at by conforming with the provisions of the royalty agreements of April 28, 1955. Mr. Jacobson stated that the intent was not to pay this amount immediately but only when the importer could afford to do so. In 1959, however, the importer under the practice then prevailing was to

credit the inventors 6 percent of the net sales obtained in the United States. From 1956 to 1961, the importer maintained a royalty account on its books indicating the invoices and serial numbers of the imported incomplete debarking machines. These accounts show for the six machines corresponding to serial numbers 58836 through 58841, covered by reappraisement R61/12950, a charge of $8,689.22, or $1,448.20 per machine. This latter amount was the sum added by the appraiser to each invoice unit price in the case of reappraisement R61/12950. The accounts also show that for the machines corresponding to serial numbers 60505 and 60506, covered by reappraisement R61/12951, charges of $1,648.86 and $1,479, respectively. These amounts correspond to the sums added by the appraiser to each invoice unit price in the case of reappraisement R61/12951. Mr. Jacobson testified that, prior to appraisement of the merchandise involved in this case, a customs representative visited his firm at Talladega, Ala., and examined its books, including the aforementioned royalty figures. The witness stated that, when his firm imported Cambio debarkers in 1956 and 1959, it incurred a liability for royalty payments to the inventors regardless of subsequent developments. The figures representing this liability were added to the invoice unit values by the appraiser. Mr. Jacobson testified that, with the exception of $50,000 paid by the importer to Andersson, consisting of $17,000 during the inventor's life and $43,000 at his death, the amounts owing on the Talladega firm's books were never, in fact, paid. Prior to adjustment, the amount on the Talladega books was $218,390. Mr. Jacobson testified that this amount was negotiated down to approximately $160,000 in 1961 and that the only amounts paid out were the aforementioned sums remitted to Andersson. On the other hand, the customs agent's report purports to show the total amounts of royalty payments made on each imported machine sold. The report is summarized in the following table.

| Type of machinery | Invoice number | Date of invoice | Serial number of machine | Royalty paid |
|---|---|---|---|---|
| Cambio-35 | 20568 | 9-3-56 | 58, 836 through 58, 841 | $8, 689. 22 |
| Cambio-66 | 22731 | 7-29-59 | 60, 505 | Not yet paid |
| Cambio-66 | 22731 | 7-29-59 | 60, 506 | $1, 479. 00 |

The information contained in the preceding table was furnished by W. R. Meehan, comptroller of Soderhamn Machine Manufacturing Co.

By virtue of the manner in which the appraisements under consideration herein were made, invoiced unit values, plus the sum in United States dollars, etc., I consider such action severable. Since plaintiffs herein are only contesting a portion of the appraisements, the additions, they are entitled to rely upon the presumption of correctness found by the appraiser which it does not challenge. *United States* v. *Fritzsche Bros.*, 35 CCPA 60, C.A.D. 37; *Kurt Orban Company, Inc.* v. *United States*, 52 CCPA 20, C.A.D. 851; *United States* v. *Gitkin Co.*, 46 Cust. Ct. 788, A.R.D. 132.

While I might not favor the method of appraisements, they being in two different currencies, there is, on the face of it, nothing which would invalidate them It is true that the law specifies the required elements for both cost of production and constructed value with precise care. However, an appraisement at invoiced unit values in Swedish currency, plus a sum in United States currency, does not *ipso facto* establish that the appraiser did not follow the statutory requirements. It is apparent that the appraiser believed the royalty was part of the value and in this instance if properly part of the dutiable value, it would fall within the provision for usual general expenses. The question of whether the royalty is part of the dutiable value is the basic issue for determination. The issue of royalties, while not profusely litigated, has been considered by the court on a number of occasions. While royalties may, under certain circumstances, be properly part of cost of production or constructed value, each case must be determined upon the facts presented. Counsel for plaintiffs cites a number of cases holding certain royalty and license fees not to be part of cost of production or constructed value. *United States* v. *Alfred Dunhill of London Co., Inc.*, 32 CCPA 187, C.A.D. 305; *R. J. Saunders & Co., Inc.* v. *United States*, 23 Cust. Ct. 311, Reap. Dec. 7754; *Henry A. Wess, Inc.* v. *United States*, 44 Cust. Ct. 747, Reap. Dec. 9724, affirmed in *United States* v. *Henry A. Wess, Inc.*, 48 Cust. Ct. 701, A.R.D. 142; *The A. W. Fenton Co., Inc.* v. *United States*, 52 Cust. Ct. 405, Reap. Dec. 10660; to which might be added *United States* v. *Hensel Bruckmann & Lorbacher, Inc.*, 39 CCPA 86, C.A.D. 468.

Most closely resembling the factual situation in this case is the *Saunders* case, *supra*, wherein unbound printed sheets were imported into the United States and here bound into books. A royalty was payable upon the sale of the completed books. I therein held it improper to add the royalty to the cost of production for the unbound printed sheets. In the instant case, incomplete machines are imported and completed in the United States. The royalty was not payable until the sale of the completed machines. By the same token and following

the reasoning in the *Saunders* case, *supra*, I am of the opinion that the royalty is not either part of the cost of production or constructed value of the incomplete machines imported herein.

On the basis of the entire record herein, I find as facts:

1. That the merchandise to which the appeals relate consists of incomplete Cambio debarking machines manufactured by Söderhamns Verkstäder AB, in Sweden and imported by Soderhamn Machine Manufacturing Co., an Alabama corporation, in which a controlling stock interest is owned by the Swedish corporation.

2. That at and immediately before the dates of exportation involved herein, neither such nor similar incomplete debarking machines were freely sold or offered for sale to all purchasers in the principal markets of Sweden for exportation to the United States, or for home consumption in Sweden, or were the imported machines offered for sale in the United States in their incomplete condition.

3. That appraisement was made in R61/12950 on the basis of cost of production and with respect to R61/12951, appraisement was made on the basis of constructed value.

4. That plaintiff does not dispute the basis of appraisement in either case.

5. That in R61/12950 appraisement was made at Sw. Crs. 29,968 each, plus U.S. $1,448.20 each, plus packing and delivery, and in the case of R61/12951, appraisement was made at Sw. Crs. 56,717.50 each, plus U.S. $1,648.86 on machine number 60505, and U.S. $1,479 on machine number 60506, both machines packed.

I conclude as matters of law:

1. Cost of production, as defined in section 402(f), Tariff Act of 1930, is the proper statutory basis for determination of the value of the merchandise subject to R61/12950 and that value is Sw. Crs. 29.968 each, plus packing and delivery charges.

2. That constructed value, as defined in section 402(d), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, *supra*, is the proper basis for determination of the value of the merchandise subject to R61/12951, and that value is Sw. Crs. 56,717.50 for each machine, packed.

Judgment will be entered accordingly.