(R.D. 11542)

Cleveland Twist Drill Co.
Seaway Forwarding Co. } *v.* United States

Entry No. 1914.

(Decided June 6, 1968)

*Thompson, Hine & Flory* (*John F. McClatchey* and *Gordon L. Smith* of counsel) for the plaintiffs.

*Edwin L. Weisl, Jr.*, Assistant Attorney General (*Harold L. Grossman*, trial attorney), for the defendant.

LANDIS, Judge: This reappraisement appeal involves licensed patents and connected fees included in the appraised value of a twist drill rolling machine, type SW–10, which plaintiffs imported from West Germany in September 1962. The machine was designed to use the licensed patents for producing twist drills.

I find, as the parties have stipulated, that the proper basis for appraisement of the machine is constructed value under section 402(d) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 70 Stat. 943, T.D. 54165. The only issue before me is the proper amount of constructed value. The answer appears to lie in the terms of an agreement for a license under licensed patents, one of which terms called for the purchase of the imported machine, in which connection the parties have stipulated as follows:

a.  On November 29, 1961, plaintiff and Rohde & Doerrenberg [hereinafter R.D.], a German Kommandtgesellschaft, entered into an Agreement. A copy of said Agreement is attached hereto as Exhibit A.

b.  In March, 1962, Rohde & Doerrenberg assigned all of its rights, title and interest in and to said Agreement, as well as the patents and patent applications referred to therein, to Rollpress A.G., of Zug, Switzerland. The documents embodying said assignment are attached as Exhibits B and C.

c.  The machine involved herein was ordered by plaintiff from Rollpress on June 28, 1962, was manufactured in Germany and shipped by Rohde & Doerrenberg from Hamburg on September 1, 1962, arrived in Cleveland on September 17, 1962, and shortly thereafter was installed in plaintiff's plant in Cleveland.

d.  The entered value of the machine was DM 180,000.

e.  Appraisement was made on the basis of constructed value under Section 402(d) of the Tariff Act of 1930, at DM 1,000,000, net, packed, FOB.

f. Plaintiff and the United States agree that constructed value is the proper basis of appraisement. [Exhibit 1.]

On trial, two witnesses testified for plaintiffs. Mr. Carl R. Apthorp, Jr., manager of mechanical development for The Cleveland Twist Drill Company, Cleveland, Ohio (hereinafter Cleveland), signed the agreement for the licensed patents and purchase of the machine for his company. Mr. John D. Robison is the appraiser who made the appraisement at Cleveland, Ohio, on August 14, 1963. A number of exhibits are also in evidence. The only exhibits I find it necessary to refer to, aside from the basic agreement (exhibit 1), are an amendment to the agreement (exhibit 5), and the licensed patents (exhibits 6 and 7). Defendant put in no evidence.

Both sides have filed briefs. Each looks to the agreement as sustaining his respective claim, plaintiffs urging that the proper amount of constructed value is DM180,000, but defendant contending that DM1,000,000, as appraised, is the correct amount of constructed value.

Constructed value is defined in section 402(d), as amended, *supra*, as follows:

(d) CONSTRUCTED VALUE.—For the purposes of this section, the constructed value of imported merchandise shall be the sum of—

(1) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise undergoing appraisement which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

(2) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise undergoing appraisement which are made by producers in the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for shipment to the United States; and

(3) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise undergoing appraisement in condition, packed ready for shipment to the United States.

Plaintiffs, as the official papers show, entered the imported machine at DM180,000. Mr. Robison appraised it at DM1,000,000. Asked to testify, Mr. Robison stated that, when he made his appraisement, he considered the agreement and concluded from the terms as to license rights that the entered value should be advanced DM820,000, the amount he included in the appraised value. DM180,000 and DM820,000

quite obviously added up to DM1,000,000, the final appraised value.

Neither the appraised value, or, for that matter, the claimed value, is broken down into amounts for each of the three constructed elements recited in section 402(d), as amended. An appraiser does not necessarily note an amount for each of the elements in section 402(d) when he appraises on that basis. *Cf. F. P. Dow, Inc., of Los Angeles, a/c Olympic Plastics Co., Inc.* v. *United States*, 51 Cust. Ct. 440, Reap. Dec. 10616. The record does not indicate, therefore, to which of the elements of constructed value the appraiser assigned the amount of DM820,000. Plaintiffs' burden, on trial, would ordinarily require proof of an amount for each of the constructed elements in section 402(d), as amended. *Philipp Wirth et al.* v. *United States*, 23 CCPA 283, T.D. 48144.

The appraisment facts on this record are, however, clearly divisible as to the entered value DM180,000, which the appraiser accepted, and the amount of advance DM820,000. Both those amounts, as testified to and found by the appraiser, are presumptively correct. 28 U.S.C. § 2633. Plaintiffs rely on the presumption as to the DM180,000 amount. They dispute the fact that DM820,000 fits any of the constructed value categories in section 402(d) and would so prove. Defendant tacitly agrees that the appraisement is separable as to the entered and advanced amounts and that all there is to determine is whether DM820,000 was properly included in the appraised constructed value. *The A. W. Fenton Co., Inc.* v. *United States*, 52 Cust. Ct. 405, Reap. Dec. 10660. I take this as an admission that if DM820,000 is not properly included in the appraised value, then DM180,000 is the correct amount of constructed value.

The law on including fees paid for a patent process in the value of an imported machine using the patent process is relatively clear. Amounts paid for the right to use a patent process, unrelated to the cost of the machine designed to use the patent process, are not part of the constructed value of the machine. *United States* v. *Tide Water Oil Co.*, 19 CCPA 392, T.D. 45554; *The A. W. Fenton Co., Inc.* v. *United States*, 52 Cust. Ct. 405, Reap. Dec. 10660. Customs administrators have accepted the legal principle and most recently published it for the information and guidance of those concerned with administration and others as follows:

VALUE

(2) *Cost of production or constructed value, section 402a(f) and 402(d) respectively, Tariff Act of 1930, as amended; license fees to use patented process; payments to erect imported machinery; components purchased in United States.*—Fees paid foreign producer of continuous nitrator units for the right to use patented process, charges for services and technical assistance incident to erection and opera-

tion of the imported machinery, and selected parts and components bought from domestic suppliers at importer's option and not exported from the United States are fees, payments and costs of a nondutiable category to be excluded from cost of production or constructed value appraisements. Letters dated September 11, 1959 and February 24, 1960. (332.1) [95 Treas. Dec. 124, 125, T.D. 55079, March 21, 1960.]

Defendant accepts the above legal premise but contends that it is not applicable to the novel factual situation presented by the agreement in this record. As defendant interprets the agreement, the DM820,000 was "obviously a part of the purchase price [for the machine], since, unless said payment were made the machine could not be commercially used for its intended, or any other, purpose, and, as a matter of fact, title in said machine did not vest in the importer until payment of the entire DM 820,000 was duly made pursuant to the terms of the Agreement." (Defendant's brief at page 8.) The agreement is before me. Its terms, contained in 17 numbered paragraphs, do not, in my opinion, connote the subtle interpretation defendant puts on them, nor do I find it necessary to interpret the agreement in terms of when title to the machine passed.

The agreement, as I read it, grew out of R.D.'s ownership of two licensed patents and Cleveland's desire for a short-term license to test the patent process with an option to take a permanent license on both patents. One patent had already issued, one was pending, at the time of the agreement. The existing patent, U.S. Patent No. 2,901,932, issued September 1, 1959, was for a "METHOD AND APPARATUS FOR MANUFACTURING TOOLS WITH A ROTATIONAL OPERATING MOVEMENT BY ROLLING." (Exhibit 6.) The pending patent, filed May 22, 1957, Serial No. 660.838 (subsequently issued on April 24, 1962, as U.S. Patent No. 3,031,553), covered an "AUTOMATICALLY CONTROLLED ROLLING MILL FOR THE PRODUCTION OF CUTTING TOOLS WITH ROTARY WORKING MOVEMENT." (Exhibit 7.) The record is not clear that the SW–10 machine in this litigation is or is not covered by either patent. I gather that it is, although the fact that it is not clear does not impress me as material to what the agreement says or as to what valuation is under section 402(d), as amended.

The terms of the agreement, and I shall here limit discussion to the basic terms relevant to the DM820,000 and the DM180,000, seem to me quite clear. R.D. licensed Cleveland to test the patents for 8 months, starting with the date the SW–10 machine was installed. In this initial period, Cleveland could not sell any drills produced from the patent process but could deliver them to customers for test and information purposes (paragraph 2(a)). Cleveland, in return for the short-term license, agreed to buy an SW–10 machine (paragraph 10) upon terms and conditions recited in exhibit A, attached to and made part of the agreement. Attached exhibit A states that the purchase price is

DM180,000 and that a royalty of DM20,000 shall be payable on purchase of each machine for use of the licensed patents as established in paragraph 2(e) of the agreement.

Prior to the expiration of the 8-month period (or as extended, *infra*), the agreement provided for Cleveland to exercise certain options. First, it could take a permanent license on the patents upon payment of a lump sum royalty of DM800,000 (paragraph 2(d)), or, it could forget the test in which case it had to return the machine without any refund of the purchase price. (Paragraph 10.) Second, it could extend the 8-month test period an additional 4 months upon payment of DM100,000 royalty (paragraph 2(b)), and get still another 4-month extension upon payment of another DM100,000 royalty (paragraph 2(c)). As additional consideration to it, Cleveland could sell any drills produced prior to or during the test period as extended. The total duration of the test periods was subsequently extended by amended agreement. (Exhibit 5.) Assuming Cleveland exercised either of the options to extend the test time, the amounts paid in consideration would be credited to the lump sum royalty payable upon exercise of the option to take a permanent license (paragraph 2(d)).

Some of the agreed terms that followed upon exercise of the option to take a permanent license help further explain, somewhat, the nature of the royalty fees. Cleveland would be licensed "to make, have made, and use, but not to lease or sell, any device or apparatus, and to practice and use any process disclosed in the Licensed Patents" for the life of the patents and any extensions and reissues thereof. (Paragraph 2(d).) It would get the blueprints to the SW–10 machine which, when delivered, came only with an operating manual and instructions. (Paragraph 10.) The DM20,000 royalty for use of the licensed patents would be payable, up to September 1, 1976, on every machine installed by Cleveland whether manufactured or purchased by Cleveland. (Paragraph 2(e).)

Mr. Apthorp testified as to what in fact followed upon the agreement. Cleveland bought, installed, and paid for the SW–10 machine in installments of DM60,000, DM60,000, and DM80,000 (the last payment included the DM20,000 royalty), as required by the terms of the purchase. (Exhibit A attached to exhibit 1.) It exercized its option to extend the test time and paid DM100,000 and DM100,000 for each extension. Finally, Cleveland did not exercise its option for a permanent license and returned the SW–10 machine as per agreement and the agreement terminated.

The amount paid (DM200,000) upon exercise of the two options to extend the test time to use the patents, as I interpret the agreement, is not an element of constructed value, as defined in section 402(d). Cleveland did not have to exercise the options and, except that it did,

there was no obligation to pay either amount, which appropriately carried its own consideration, namely, more time to test and the right to sell drills produced prior to and during the extended period. The same is true of the amount that would have been payable (DM600,000 as adjusted) upon exercise of the option to take permanent license to the patents. The option carried its own consideration, it was not exercised, no obligation to pay arose, and the royalty in fact was not paid.

While, on its face, the DM20,000 royalty payable on purchase of each machine for use of licensed patents as established in paragraph 2(e) of the agreement could conceivably upon some state of facts be interpreted as part of price, I am persuaded that here it is not part of price for several reasons. To include the royalty in the price of the machine, I would have to find that the patent process had no value apart from the machine. This I cannot do on a record where Cleveland paid so much to test the patents and was prepared to pay more for a permanent license to the patents if they proved out. Also, the particular royalty was payable on every machine Cleveland might install and operate designed to employ the process claimed in the licensed patents, whether manufactured by Cleveland, manufactured for it, or purchased by Cleveland from R.D. to September 1976. (Paragraph 2(e).) Consistent with this, the royalty was not paid for the right to use the machine, but the right to use the patents.

Substantively, the agreement is not much different from the contract in *United States* v. *Tide Water Oil Co.*, 19 CCPA 392, T.D. 45554. There the contract also involved royalties payable for license to a patent and purchase of a plant designed to use the patent process. The royalties were held not to be part of the export value of the plant. When title passes to merchandise, the theory on which defendant strongly relies may assist the court, as in *Tide Water*, to identify what the money was paid for, merchandise or license rights. It is not, in my opinion, decisive where the consideration exchanged is otherwise clear from the contracting agreement. The fact that the agreement required Cleveland to return the machine, as it did, upon failure to exercise the option to take a permanent license on the patent was nothing more than the penalty Cleveland paid for failure to exercise the option. *Cf. F. P. Dow, Inc., of Los Angeles, a/c Olympic Plastics Co., Inc.* v. *United States*, 51 Cust. Ct. 440, Reap. Dec. 10616.

I find as facts:

1. That the merchandise of this appeal is an SW–10 twist drill rolling machine, designed to use a patent process for the production of twist drills, exported from West Germany in 1962.

2. That the machine was ordered pursuant to an agreement and grant of license, under licensed patents, to test the patents in connection with the operation of the SW–10 machine; that the license to test

was granted in consideration of purchase of the machine and payment of DM20,000 royalty for use of the patent process in connection with the operation of the machine, and that the test was for a limited period commencing with the date the machine was installed, during which period none of the drills produced in the test could be sold.

3. That the machine was purchased upon terms and conditions recited in an instrument attached to the agreement which stated the price to be DM180,000 and required payment of DM20,000 royalty for use of licensed patents in connection with operation of the machine as established by the agreement.

4. That incident to the test of the licensed patents, pursuant to the agreement, DM200,000 royalty was paid in consideration for extending the test time and the right to sell drills produced from the test prior to and during the extended period.

5. That the agreement provided for grant of a permanent license to the patents at the option of the purchaser of the machine upon payment of an adjusted royalty of DM600,000, and of other valuable consideration, which option the purchaser elected not to exercise.

6. That the machine was entered for consumption at Cleveland, Ohio, at a value of DM180,000.

7. That the appraiser at Cleveland, Ohio, advanced the entered value DM820,000 which amount he computed from the terms of the agreement to pay royalty fees for license rights, and which amount he added to the entered value to arrive at an appraised value of DM1,000,000, net packed, f.o.b., constructed value basis under section 402(d) of the Tariff Act of 1930, as amended.

8. That DM180,000 was paid as the consideration for purchase of the machine; that the machine was ordered and DM220,000 royalty was paid as the consideration to test and use the licensed patents in connection with the operation of the machine; that the DM600,000, adjusted royalty, was the consideration payable upon exercise of the option to take a permanent license under the patents, but that said option was never exercised and the DM600,000 was not paid.

I conclude as a matter of law:

1. That constructed value, as defined in section 402(d) of the Tariff Act of 1930, as amended, is the proper basis for determining value of the SW-10 machine in this appeal for reappraisment.

2. That amounts paid as royalty for license rights to use licensed patents in connection with the operation of the SW-10 machine in this appeal to reappraisement are not an element of constructed value under section 402(d) of the Tariff Act of 1930, as amended.

3. That the constructed value of the SW-10 machine herein is the appraised value, less DM 820,000.

Judgment will enter accordingly.